UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AMAR BELL,

                         Plaintiff,

     vs.                                          9:06-CV-544
                                                      (NAM/GJD)

DONALD J. BEEBE, et al.,

                         Defendants.
_____

APPEARANCES:                                OF COUNSEL:

AMAR BELL
02-A-1762
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562
Plaintiff *Pro se*

Office of the New York State Attorney General     Adrienne J. Kerwin, Esq.
The Capitol
Albany, NY 12224
Attorney for Defendants

**Hon. Norman A. Mordue, Chief U.S. District Judge**

## ORDER

In this civil rights complaint, plaintiff alleges that he was assaulted and then denied proper medical care in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (Dkt. No. 1). Plaintiff also initially alleged that defendant Julie Daniels, the Inmate Grievance Program (IGP) Supervisor, did not properly process plaintiff's grievance regarding the alleged assault. (Dkt. No. 1 at ¶¶ 13-14). On June 29, 2007, this Court granted defendant Daniels's motion to dismiss this action against her. (Dkt. No. 38).

Presently before this Court is a motion to dismiss filed on behalf of the remaining defendants pursuant to FED. R. CIV. P. 37(b). (Dkt. No. 37). Defendants request dismissal as a sanction for plaintiff's failure to participate in, and his behavior during, his deposition. (Dkt. No. 37). Defendants also request reimbursement for expenses in the amount of $ 2,026.82. (Dkt. No.

37-9 Memorandum of Law at 8). Plaintiff has not responded to the motion, despite being given an additional opportunity to do so by this Court. (Dkt. No. 41). For the following reasons, this Court will deny defendants' motion to dismiss ***without prejudice to renewal*** within 30 days, after defendants obtain additional information regarding plaintiff's mental condition at the time of the attempted deposition as well as after the deposition.

## DISCUSSION

**1.     Facts**

This Court will only briefly review the facts against the remaining defendants as alleged in the complaint for clarity. Plaintiff alleges that on February 12, 2006, he requested "emergency sick call." Compl. ¶ 1 (Dkt. No. 1). Plaintiff claims that twenty minutes later, defendant Ralston[1] arrived with a stretcher, but that when plaintiff arrived at the hospital, he was placed in an examination room and assaulted by defendants Ralston, Hover, Brown, and Mulcahy. Compl. ¶¶ 2-3. Plaintiff claims that defendants Nurse Harris and Physician's Assistant Nesmith stood nearby and watched the assault. Compl. ¶ 3.

Plaintiff states that he was later escorted back to his housing unit, but was again assaulted by defendants Ralston, Beebe, and Mulligan. Comp. ¶¶ 5-6. Plaintiff claims that defendant Murray arrived after the assault and "called it a 'use of force.'" Compl. ¶ 7. Defendant Murray then ordered a "spit mask," but plaintiff claims that the mask was put on incorrectly so that it acted as a blindfold. Compl. ¶¶ 7-8. Plaintiff then alleges that he was escorted to another room where he was again assaulted by defendant Ralston. Compl. ¶ 8.

Plaintiff claims that on February 16, 2006, he was taken to the facility hospital and examined by defendant Nesmith and defendant Dr. Whalen. Comp. ¶ 10. Plaintiff states that Dr.

---

[1] The Court notes that this defendant's name is misspelled. The Acknowledgment of Service signed by defendant shows that his name is spelled "Ralston." (Dkt. No. 22 at 2). The Court will use the proper spelling of this defendant's name.

Whalen told plaintiff that the assault[2] was plaintiff's fault and sent him out of the office. Comp. ¶ 11. Plaintiff claims that he "signed up" for sick call on many occasions, but did not receive any medical attention for his injuries.[3]

## 2. **Discovery Sanctions**

Rule 37(b)(2)(C) specifically authorizes a court to dismiss an action if the party disobeys ***an order of the court*** to provide discovery. The imposition of sanctions under Rule 37 is within the discretion of the district court, and the sanction of dismissal is a harsh remedy to be used "only in extreme situations." *Bobal v. Rensselaer Polytechnic Institute*, 916 F.2d 759, 764 (2d Cir. 1990), *cert. denied*, 499 U.S. 943 (1991). Other sanctions include preclusion, expenses, and attorneys fees. FED. R. CIV. P. 37(b)(2). In order to impose the severe sanction of dismissal, the court must find willfulness, bad faith, or fault on the individual from whom discovery is sought. *Bobal*, 916 F.2d at 764. The party in question, particularly a *pro se* litigant, must have had ***prior notice*** that violation of the court's order would result in dismissal with prejudice. *Simmons v. Abruzzo*, 49 F.3d 83, 88 (2d Cir. 1995).

In determining whether dismissal is appropriate, a court must consider factors such as" (1) the duration of plaintiff's failure to comply with the court's order; (2) whether plaintiff had notice that failure to comply could result in dismissal; (3) whether defendants are likely to be prejudiced by further delay; (4) the balance between the court's interest in managing its docket and the

---

[2] The complaint is unclear regarding what Dr. Whalen was blaming on plaintiff. The exact language in the complaint states that "Timothy Whalen MD stated thats [sic] my fault then kicked me out [sic] his office and said I threatened by speaking of Public Health Law." Comp. ¶ 11. It appears that plaintiff is trying to claim that Dr. Whalen told plaintiff the assault was his fault and then told plaintiff to leave his office. Plaintiff may also be claiming that Dr. Whalen accused plaintiff of "threatening" the doctor by mentioning violations of the Public Health Law.

[3] The Court notes that some of the dates that plaintiff claims to have been denied treatment for his injuries are ***prior to the alleged assaults on February 12 and 16, 2006.*** Comp. ¶ 11. Plaintiff has listed dates in January and early February of 2006. He also lists dates as late as November and December of 2006. *Id.* In paragraph 12 of the complaint, however, plaintiff admits that he saw Dr. Whalen "36" days "later." Compl. ¶ 12.

plaintiff's right to be heard; and (5) a consideration of sanctions less drastic than dismissal. *Spencer v. Doe*, 139 F.3d 107, 112-13 (2d Cir. 1998).

In order to depose an incarcerated individual, the Federal Rules of Civil Procedure require an order from the court. FED. R. CIV. P. 30(a). On March 21, 2007, at defense counsel's request, Magistrate Judge Di Bianco issued such an order in this case. (Dkt. Nos. 34, 35). The order specifically states that (1) plaintiff's disagreement with any security directives at the correctional facility "is not a ground on which the plaintiff may refuse to answer questions," and (2) "the failure of plaintiff to attend, be sworn and answer appropriate questions may result in sanctions including dismissal of the action . . . ." (Dkt. No. 35).

On May 4, 2007, defendants sent plaintiff notice of the deposition. (Dkt. No. 37, Ex. A). On May 22, 2004, defense counsel traveled to Sing Sing Correctional Facility to take plaintiff's deposition in accordance with the notice served on plaintiff. The transcript of the attempted deposition has been filed as Exhibit B to defendants' motion to dismiss. (Dkt. No. 37-(4-5)). A review of the transcript shows that plaintiff made it impossible for defense counsel to obtain any information regarding the alleged facts in this case.

The deposition started by defense counsel explaining the deposition process and asking plaintiff if he was under any medications that might make it difficult for him to understand counsel's questions. Deposition Transcript (T) at 4-7. When counsel asked plaintiff if he was taking any medications, plaintiff answered in the affirmative, naming several medications, including Lithium. (T. 7). Plaintiff stated that he did not know if those medications would prevent him from understanding counsel's questions. *Id.* Plaintiff then stated that "[i]t's complicated because I'm hearing voices." (T. 8). Plaintiff stated that the voices were telling him how he was going to answer the questions, and that the voices were saying that "Satan rules." *Id.* At that point, counsel went off the record briefly to determine if the stenographer felt comfortable

4

enough to continue. (T. 9). When counsel went back on the record, he stated that he understood that plaintiff's medications might pose a problem for him understanding the questions, but that counsel was going to try to continue. (T. 9).

Unfortunately, the "voices" told plaintiff not to answer even the most basic questions regarding his length of incarceration. (T. 10). Counsel then read Magistrate Judge Di Bianco's order to plaintiff, particularly the part of the order providing for sanctions, including dismissal, if plaintiff failed to answer questions. (T. 11). Plaintiff stated that he did not understand and then told defense counsel that "Satan says nobody answers questions. . . . Satan is the king. . . . I'm the prince of darkness." (T. 12). Without repeating all the testimony, the Court would simply note that the conversation continued in the same fashion, with plaintiff making incomprehensible statements about Satan, "leopard-skinned" people, and threatening that Satan would "bomb D' Bianco [sic]." (T. 13-17).

Defense counsel reminded plaintiff several times that his case could be dismissed if he did not cooperate with the deposition and respond to appropriate questions. (T. 14-15). Plaintiff then appeared to begin to answer questions, including stating that he had been incarcerated for approximately seven and one half years, but that he did not remember committing a crime. (T. 17). Plaintiff was shown his disciplinary record, but stated that he did not remember any of the incidents, and stated that he had been falsely accused. (T. 19-24). While plaintiff was being questioned regarding his disciplinary history, he stated that there were things that he did not remember because he was sent to a psychiatric hospital. (T. 30).

Although at times, plaintiff would respond appropriately to a question, the response would generally be followed by a comment that did not make sense regarding leopard-skinned people. (T. 31-38). Plaintiff stated that although he had been charged with spitting on a corrections officer, he would never do that. (T. 37-38). Plaintiff then stated that he remembered the incident

5

mentioned in this complaint in which defendants allegedly placed a "spit mask" on plaintiff, not to stop him from spitting, but so that plaintiff would not see the defendants assault him. (T. 38-39). Plaintiff also managed to remember the names of the individuals that he alleged placed the mask on him. (T. 39-40).

In another moment of apparent clarity, plaintiff stated that he remembered the January 19, 2006 incident that is also one of the subjects of this civil rights complaint. (T. 41). Plaintiff testified that on January 19, 2006, he was assaulted, but that he did not remember the names of the officers and was not sure why he was assaulted. (T. 41-42). Then plaintiff stated that "they" knew he was a prince, and "[t]hat's what the whole thing was about, me being a prince." (T. 43). Defense counsel then attempted to review the transcript of the disciplinary hearing with plaintiff, but plaintiff continued to be difficult. (T. 46-52). Plaintiff did not remember stating at the disciplinary hearing that the conduct in question was something that the "bad Bell" would do. *See e.g.* (T. 47).

Later, plaintiff appeared to coherently discuss the claim of assault that he has in this complaint. (T. 69-82). Defense counsel also asked plaintiff about the grievance that he wrote regarding the incident. (T. 83). The discussion that ensued at that point was also relatively coherent, however, plaintiff testified that he did not know how he obtained the names of the individuals who assaulted him. (T. 83-96). Plaintiff also testified that after defendants assaulted him, they obtained him treatment for his chest pains, but that he never made it back to his cell afterward because he was assaulted again. (T. 96-98).

At a certain point, plaintiff stated that he was not "going through this piece by piece." (T. 106). Plaintiff then stated that he had gone "over this a thousand times" and that it was "over." (T. 106). Plaintiff told defense counsel that he was hungry, and defense counsel arranged for plaintiff to be brought lunch, however, when the lunch was delivered, plaintiff refused to eat it

because it was cold. (T. 107).  Instead, plaintiff stated that he wished to continue with the deposition. (T. 107).  Plaintiff then continued to testify and related the portion of the alleged incident in which defendants placed a "spit mask" on plaintiff so that he would not be able to see the assault. (T. 107-120).

Suddenly, plaintiff stopped answering questions completely and stated that defense counsel could not force plaintiff to answer questions. (T. 135).  Plaintiff stated that he was the "prince", that 350 dollars was nothing, and that he did not care if the case were dismissed. (T. 135).  Plaintiff became more and more agitated. (T. 136-37).  Defense counsel states that he became concerned for his safety and the safety of the stenographer, and thus, terminated the deposition. Defendants' Memorandum of Law at 4, (T. 137).

A thorough reading of the deposition in this case certainly shows that plaintiff did not cooperate with the deposition.  However, it is also clear that plaintiff has some significant psychiatric problems.  This finding is based upon the variety of medicines that plaintiff testified to taking, together with the fact that approximately one month after the deposition, plaintiff was sent to Central New York Psychiatric Center for ninety days. *See* (Dkt. No. 40).  Plaintiff sent a letter to the Court, stating that he had just been released from Central New York Psychiatric Center. (Dkt. No. 40).  Although this letter was stricken from the record for failure to serve the letter on opposing counsel, the Court finds that the fact of plaintiff's psychiatric hospitalization is important to the issues involved in defendants' motion to dismiss.  The Court also notes that during the deposition, when plaintiff was reading from the transcript of a disciplinary hearing, it appeared from that disciplinary hearing transcript that plaintiff may have been experiencing some psychiatric problems.

It is true that plaintiff did not fully cooperate with the deposition and used abusive language toward defense counsel and toward the Court.  Plaintiff was warned several times about

7

the consequences of his failure to cooperate.  Magistrate Judge Di Bianco's order specifically stated that dismissal was a possible sanction for failure to answer questions, and defense counsel mentioned the possible sanction of dismissal during the deposition.  As stated above, defense counsel actually read Magistrate Judge Di Bianco's order to plaintiff.

It is unclear if the plaintiff's psychiatric condition or medications affected plaintiff's behavior.[4]  Plaintiff has not responded to defendants' motion to dismiss, although he was given an opportunity to do so.   There is no indication that plaintiff did not receive a copy of the defendants' motion since it does not appear that he was transferred to the psychiatric hospital until after the motion was served.  It is unclear, however, what plaintiff's condition was prior to the transfer, thus, even if plaintiff received a copy of the motion papers, he may not have been able to properly respond at the time.  The only communication from plaintiff since that time is the notice that he was released from the psychiatric center that was stricken from the docket for failure to serve opposing counsel.  Deposition testimony is very important to this case in which plaintiff is alleging that defendants assaulted[5] him on two occasions during one day.  Thus, defendants will be prejudiced by further delay or denial of this discovery.

Certainly, plaintiff's conduct at the deposition was inappropriate, and under normal circumstances, the Court would consider dismissal as an appropriate sanction.  However, the Court does not have enough information about plaintiff's medical or mental condition to make that determination.  The same is true before the Court can consider other lesser sanctions.  Because plaintiff is *pro se* and because plaintiff appears to have some sort of psychiatric condition, this Court will deny defendants' motion without prejudice to renewal and the

---

[4] The Court notes that Lithium is used in cases of manic depressive illness. Physicians' Desk Reference (PDR), 61st Edition 2007, p. 1692.  The Court notes that some of the symptoms of manic depressive illness include pressured speech, grandiosity, flight of ideas and possibly hostility. *Id.*

[5] Plaintiff also alleges that he was sexually assaulted during these incidents.

presentation of additional information. If plaintiff's behavior was caused by his illness, then the Court cannot find that he acted in "bad faith" or "wilfully" in failing to respond properly to counsel's questions.

The Court has also considered defendants' request for reimbursement of expenses, but will also deny that request without prejudice, pending further information about plaintiff's condition. As stated above, if plaintiff's behavior was caused either by his illness or by side effects from his medications, a requirement that he pay defense counsel's expenses for the failed deposition may not be justified. The Court also notes that plaintiff did answer some questions regarding his view of the alleged assault even though he became agitated and refused to continue.

**WHEREFORE,** based on the findings above, it is

**ORDERED** that defendants' motion to dismiss pursuant to FED. R. CIV. P. 37 (Dkt. No. 37) is **DENIED WITHOUT PREJUDICE TO RENEWAL WITHIN 30 DAYS** of the date of this order, based on additional information regarding plaintiff's psychiatric condition and the effect that it may have had on his behavior at the deposition.

IT IS SO ORDERED

Dated: November 15, 2007

_____
Norman A. Mordue
Chief United States District Court Judge